Filed 12/17/24  P. v. Garland CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081057 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWVRS025042) |
| JACKIE LEE GARLAND, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino, Lorenzo R. Balderrama, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General for Plaintiff and Respondent.

# I

# INTRODUCTION

Jackie Lee Garland served nine years in state prison for forcibly raping and committing other sex crimes against a woman he did not know. When he became eligible for parole, the district attorney instituted civil commitment proceedings against him under the Sexually Violent Predator Act (Welf. & Inst. Code,[1] § 6600 et seq.; SVPA). After a pretrial delay of twenty years, the matter proceeded to a bench trial. At the conclusion of the trial, the trial court found Garland was a sexually violent predator and committed him to the Department of State Hospitals (DSH).

Garland appeals. He challenges the commitment order on several grounds, claiming: (1) there was insufficient evidence to support the trial court's finding that he was a sexually violent predator in need of commitment; (2) the court improperly admitted hearsay evidence offered by the prosecution; (3) the court erroneously limited the testimony of his expert witness; and (4) the pretrial delay violated his constitutional right to a speedy trial.

We reject Garland's arguments concerning the sufficiency of the evidence and the court's evidentiary rulings. Further, although the pretrial delay was undoubtedly substantial, we also reject Garland's claim that his right to a speedy trial was violated. In short, there was no speedy trial violation because Garland and his defense team were principally responsible for the pretrial delay and, for years on end, Garland executed written waivers of his right to a speedy trial. Because we reject Garland's speedy trial argument as well, we affirm the commitment order.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

## II

## BACKGROUND

A. *Civil Commitment Under the SVPA*

"The Legislature first enacted the [SVPA] in 1995, expressing concerns about 'a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes.' [Citation.] In its findings and declarations for the [SVPA], the Legislature described its intent to 'identify these individuals prior to the expiration of their terms of imprisonment' and, if they are 'found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt,' to ensure that they 'be confined and treated until such time that it can be determined that they no longer present a threat to society.' " (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 368–369 (*Camacho*).)

"The process for committing an individual under the SVPA begins when the California Department of Corrections and Rehabilitation (CDCR) refers an incarcerated individual for an initial mental evaluation. (§ 6601, subd. (a).) Typically, this step must be done at least six months prior to the individual's scheduled prison release date. (*Ibid*.) To decide who it refers for evaluation, the CDCR first screens incarcerated individuals' 'social, criminal, and institutional history' and identifies individuals who have committed qualifying sexually violent predatory offenses. (*Id*., subd. (b).) If the CDCR determines someone is 'likely to be a sexually violent predator,' it refers that person to the … []DSH[] for a full evaluation of whether that individual

3

meets the SVPA's criteria for civil commitment." (*In re Tellez* (2024) 17 Cal.5th 77, 84 (*Tellez*).)[2]

After the CDCR refers an individual to the DSH, "[t]he DSH is then required to apply a standardized assessment protocol to identify diagnosable mental disorders and other factors known to be associated with the risk of committing another sexual offense. (§ 6601, subd. (c).) Risk factors include 'criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder.' (*Ibid.*) This standardized assessment involves separate evaluations by two different practicing psychiatrists or psychologists. (§ 6601, subd. (d).) If both evaluators agree that the individual is likely to reoffend without appropriate treatment and custody in a secure facility, the DSH Director forwards a request to the county prosecutor to petition for the individual's commitment to a state hospital." (*Tellez, supra*, 17 Cal.5th at p. 84, fn. omitted.)

"If the county prosecutor agrees with the assessment, they file a petition in the superior court for commitment under the SVPA. (§ 6601, subd. (i).) The superior court judge then reviews the petition and conducts a probable cause hearing to determine whether the defendant is likely to engage in sexually violent predatory criminal behavior upon their release. (§ 6602, subd. (a).) The defendant is entitled to assistance of counsel for this hearing and remains in custody until the hearing is completed. (*Ibid.*) If the superior court judge determines that there is no probable cause to pursue the commitment, the petition is dismissed. (*Ibid.*) If the judge determines that

---

[2]     The Department of Mental Health was a precursor to the Department of State Hospitals. (*Needham v. Superior Court* (2024) 16 Cal.5th 333, 353, fn. 4 (*Needham*).) For purposes of clarity, we will use the acronym DSH when referring either to the Department of Mental Health or the Department of State Hospitals.

there is probable cause, the court must conduct a trial to determine whether the individual qualifies as a 'sexually violent predator.' (§ 6600, subd. (a)(1).) The individual remains in custody until the trial is completed." (*Tellez, supra*, 17 Cal.5th at pp. 84–85, fn. omitted.)

The SVPA "provides for [DSH] evaluations to be updated or replaced after a commitment petition has been filed. [Citation.] Section 6603, subdivision (c) was enacted to clarify the right of the attorney seeking commitment to obtain up-to-date evaluations, in light of the fact that commitment under the SVPA is based on a 'current mental disorder.' [Citation.] If an updated or replacement evaluation results in a split of opinion as to whether the individual meets the criteria for commitment, the []DSH must obtain two additional evaluations in accordance with subdivision (f) of section 6601. [Citation.] However, although initial evaluations conducted under section 6601 must agree, a lack of concurrence between updated or replacement evaluations does not require dismissal of the petition. [Citation.] Rather, the updated evaluations' primary purpose is evidentiary or informational." (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 647–648.)

" 'The trial represents the final step in the "complex administrative and judicial process" required to civilly commit an individual as a[] [sexually violent predator].' " (*Needham, supra*, 16 Cal.5th at p. 351.) "At the trial, the state bears the burden of proving beyond a reasonable doubt that the individual falls within the statutory definition of a sexually violent predator. (§ 6604.)" (*Tellez, supra*, 17 Cal.5th at p. 85.) To meet this burden, the People must prove three elements: "(1) the person has suffered a conviction of at least one qualifying 'sexually violent offense,' (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and

5

safety of others,' and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody." (*People v. Yates* (2018) 25 Cal.App.5th 474, 477.)

The defendant "is entitled to the assistance of counsel and the right to a jury trial. (§ 6603, subd. (a).) If the defendant opts for a jury trial, then the jury's verdict must be unanimous. (*Id.*, subd. (g).) If the trial results in a finding that defendant falls within the statutory definition of a sexually violent predator, the defendant is then committed to a state hospital for treatment for an indefinite amount of time. (§ 6604.)" (*Tellez, supra*, 17 Cal.5th at p. 85.) "An individual who is committed under the SVPA is entitled to a yearly evaluation to determine whether they may be conditionally or unconditionally discharged. (§ 6604.9.)" (*Tellez*, at p. 85.)[3]

B. *Garland's Criminal History*

Garland was born in 1953.

In 1972, Garland was convicted of statutory rape in Ohio. He served 60 days at the Cincinnati Workhouse.

In 1975, Garland was convicted of rape in Ohio. The conviction stemmed from an incident in which Garland knocked on the door of a 27-year-old stranger, asked to use her phone, entered her home, and held her at knifepoint. He demanded the victim remove her clothes and orally copulate him. When she refused, he demanded she masturbate him. She again refused. Garland then threatened her with his knife and raped her. After raping the victim, he tried to stab her, hit her in the face, and ran the knife

---

[3] "As initially enacted, the [SVPA] provided for renewable two-year commitment terms. [Citations.] In 2006, however, voters passed Proposition 83 (Gen. Elec., Nov. 7, 2006), which replaced these renewable two-year terms with an indefinite commitment from which the individual can be released if it is shown that the individual no longer qualifies as [a sexually violent predator]." (*Camacho, supra*, 15 Cal.5th at p. 370.)

blade across her throat.  Garland was sentenced to prison for seven to 25 years, but was released on parole after four years.

In 1980, Garland was convicted of felony assault in Ohio.  The conviction arose from an incident in which Garland pulled his vehicle into the driveway of a 45-year-old stranger doing yardwork and asked if she was interested in having a sidewalk built.  She declined and, fearing for her safety, started walking towards her home.  Garland approached the victim from behind, placed his hands around her throat, choked her, and repeatedly punched her in the face.  He was sentenced to prison for three to 15 years and released on parole after 11 years.

In 1990, Garland was convicted of making a threat against the President of the United States in Ohio.  He was sentenced to prison for one year and one day.

In 1993, Garland was convicted of forcible rape, forcible oral copulation, anal or genital penetration by a foreign object, and other charges in San Bernardino County.  The convictions stemmed from an incident that took place in November 1992.  A 20-year-old female employee at a rental car company was checking on a vehicle in a parking lot when Garland pushed her into the vehicle, took the vehicle keys from her, and started driving.  He forced the victim to orally copulate him, digitally penetrated her, and raped her.  Garland was sentenced to prison for 18 years and had an estimated parole release date in 2002.

C. *Garland's Civil Commitment Proceedings*

In March 2002, the DSH presented a recommendation to the district attorney that Garland be committed as a sexually violent predator.  Together with its recommendation, the DSH submitted reports from two psychologists,

7

both of whom believed Garland satisfied the sexually violent predator criteria.

In April 2002, the district attorney petitioned to commit Garland as a sexually violent predator. In May 2002, the trial court found probable cause to believe Garland was a sexually violent predator and committed him to a state hospital pending trial. As we will discuss, *post* § III(D)(1), the matter was then continued numerous times, almost always at the request of the defense or the joint request of the parties.

In 2010, Garland filed a motion under *In re Ronje* (2009) 179 Cal.App.4th 509 (hereafter, a *Ronje* motion), which asked the court to order the DSH to conduct new evaluations on grounds that the psychologists who previously evaluated him relied on an assessment protocol the DSH had adopted in a procedurally improper manner. The court granted the motion, in part, and ordered new evaluations. Dr. Douglas Korpi and another DSH psychologist prepared and submitted new evaluations finding that Garland satisfied the sexually violent predator criteria.

In 2011, the trial court held a new probable cause hearing and again found probable cause to believe Garland was a sexually violent predator.

In 2014, the prosecution requested that the DSH evaluators update their evaluations of Garland. In the course of updating his evaluation, Dr. Korpi changed his determination that Garland satisfied the sexually violent predator criteria. This created a split of opinion with the second evaluator who reaffirmed her prior determination that Garland was a sexually violent predator. In light of the split of opinions, the DSH replaced both evaluators with new ones. The new evaluators, Dr. Harry Goldberg and Dr. Kathleen Longwell, completed their evaluations in March 2015, and both determined that Garland satisfied the sexually violent predator criteria.

8

The case was continued several more times before trial began. These continuances will also be discussed *post* § III(D)(1).

D. *Civil Commitment Trial*

A bench trial commenced on July 11, 2022. At the trial, Dr. Goldberg and Dr. Longwell testified that Garland met the criteria for a sexually violent predator, while Dr. Korpi and another defense expert, Dr. Brian Abbott, testified that he did not meet the criteria.[4]

1. *Testimony of Dr. Goldberg*

Dr. Goldberg is a forensic psychologist who has worked as a sexually violent predator evaluator for the DSH since 1995. He has completed over a thousand forensic assessments and court reports pertaining to sexually violent predator patients.

Dr. Goldberg evaluated Garland in 2015 and updated his evaluation in 2019, 2020, and January 2022. He interviewed Garland in 2015, and tried to interview him for the updated evaluations. However, Garland refused to be interviewed for the updates, even though the court ordered him to submit to interviews. Dr. Goldberg also reviewed thousands of pages of police reports, court documents, and state hospital records. Each time Dr. Goldberg evaluated Garland, he concluded Garland met the criteria for commitment as a sexually violent predator.

Dr. Goldberg diagnosed Garland with other specified paraphilic disorder, sexual attraction to nonconsenting persons. According to Dr. Goldberg, a person suffers from other specified paraphilic disorder if he or she is sexually aroused by atypical thoughts, fantasies, and behaviors, which cause distress or impairment to the person or create a risk of harm to the

---

[4]    The prosecution also elicited testimony from the victim of the felony assault Garland perpetrated in 1980.

person or others. In reaching this diagnosis, Dr. Goldberg relied, in part, on the fact Garland perpetrated four sex-related crimes—the 1972 statutory rape, the 1975 rape, the 1980 felony assault (which had a "sexual motivation," according to Dr. Goldberg), and the 1993 forcible rape—and the fact he used excessive force to accomplish the crimes. He also based his diagnosis on Garland's infliction of emotional and physical trauma on the victims of his crimes, his denial of any responsibility for the crimes, and the fact he committed acts of verbal and physical aggression against female staff members and others at the state hospital. In particular, Garland engaged in 20 documented acts of verbal aggression and 11 documented acts of physical aggression while in DSH custody.

Dr. Goldberg also diagnosed Garland with antisocial personality disorder (ASPD), a disorder in which a person does not comply with social norms, lacks remorse, and exhibits callousness, manipulativeness, and recklessness. Dr. Goldberg noted that Garland acted impulsively in connection with his crimes, showed a complete lack of remorse, minimized or denied responsibility for the crimes, and engaged in verbal and physical assaults at the state hospital. Dr. Goldberg also testified that he assessed Garland with the Hare Psychopathy Checklist, otherwise known as the Psychopathy Checklist Trait Revised (PCL-R), a 20-factor assessment tool aimed at determining the presence or degree of psychopathy. Garland scored higher on the assessment—i.e., he displayed more psychopathic traits—than 71 to 75 percent of North American offenders.

Dr. Goldberg opined that Garland's conditions, working in combination, satisfied the SVPA's requirement of a diagnosed mental disorder. He testified they affected Garland's volitional capacity as shown by his lengthy history of sex crimes, which he perpetrated even when he was on parole

10

under the risk of incarceration. He emphasized that Garland refused sex offender treatment at the state hospital and continued to exhibit aggressive and hostile behaviors there. He also noted that Garland showed no sympathy for his victims and prioritized his sexual gratification above all else.

Dr. Goldberg assessed Garland with the Static-99R, an actuarial instrument that estimates a person's likelihood of being charged with, or convicted of, another sex offense. Garland scored a five on the Static-99, which corresponded with an above average risk he would reoffend compared to other sex offenders. He had a higher score on the Static-99R than 88.7 percent of sex offenders. According to Dr. Goldberg, sex offenders falling within the above average risk category reoffend at a rate of 21.2 percent within five years and 32.1 percent within ten years. Dr. Goldberg also administered the Static-2002R, an updated actuarial instrument akin to the Static-99R. Garland scored a five on the Static-2002R, placing him in the above average risk category. For offenders in this category, 19.1 percent are charged or convicted of a sex crime within five years. Garland also scored a 3.5 on the Structured Risk Assessment—Forensic Version (SRA-FV), an instrument that measures a person's likelihood of reoffending using dynamic risk factors. His score placed him in the high risk category.

Based on Garland's risk assessment scores, his interview with Garland, and his review of the documentary record, Dr. Goldberg opined that Garland likely would engage in sexually violent predatory criminal behavior without treatment and custodial commitment.

2. *Testimony of Dr. Longwell*

Dr. Longwell is a forensic psychologist who has performed about 4,000 sexually violent predator evaluations for the DSH since 1996.

Dr. Longwell evaluated Garland in 2015 and updated the evaluation in 2019, 2020, and December 2021. She interviewed him in 2015 and tried to

interview him in 2019, 2020, and 2021, but he refused the latter three interview requests. Dr. Longwell also reviewed about 20,000 pages of documents including state hospital records. Each time she evaluated Garland, she concluded he satisfied the sexually violent predator criteria.

Dr. Longwell diagnosed Garland with other specified paraphilia, sexual attraction to nonconsenting persons. She opined his criminal history showed he had "sexual urges and desires of forcing himself sexually on females for his sexual gratification." She testified his pattern of reoffending after each release from custody showed "his urges were so strong that they overcome his fear of being punished," and his verbal attacks on female staff members at the state hospital evinced a continued hostility towards women.

Dr. Longwell diagnosed Garland with ASPD as well. She testified he exhibited significant anger management problems, gave untruthful and unreliable accounts about his criminal record, showed no remorse or guilt for his crimes, and led a "life [that] [was] a testimony of impulsiveness," as evidenced by his substance abuse problems, his failure to complete high school, his inability to hold a job, and his long bouts of incarceration. According to Dr. Longwell, he scored a 31 on the Hare Psychopathy Checklist, which placed him on the high range for psychopathy.

Dr. Longwell opined there was a serious and well-founded risk Garland would commit a sexually violent crime outside of custody. She administered several actuarial instruments on him, including the Static-99R, the Static-2002R, the Sex Offender Risk Appraisal Guide (SORAG), the Violence Risk Appraisal Guide (VRAG-R), and the SRA-FV. He scored a five on the Static-99R, an above average score, which placed him in a group of sex offenders who reoffend at a rate of 21.2 percent within five years. He scored a five on the Static-2002-R, an above average score that put him in a group of sex

12

offenders who reoffend at a rate of 19.1 percent within five years. On the SORAG, he scored a 23, an above average score that put him in a category in which 58 percent of members are prosecuted for a new sex crime within seven years and 80 percent are prosecuted for a new sex crime within 10 years. He scored a 32 on the VRAG-R, which put him in the highest risk group with individuals who reoffend at a rate of 76 percent within five years and 87 percent within 12 years. Finally, he scored a 4.11 on the FRA-FV, placing him in the high risk category of offenders with a significant need for treatment to avoid sexual recidivism.

### 3. *Testimony of Dr. Abbott*

Dr. Abbott is a forensic psychologist who has conducted sexually violent predator evaluations exclusively for defendants since 2002.

Dr. Abbott did not serve as a DSH evaluator in Garland's case. However, Dr. Abbott evaluated his eligibility for commitment in 2006, then issued updated evaluations in 2012, 2019, and 2021. Dr. Abbott interviewed Garland and reviewed his law enforcement reports, probation report, state hospital records, and the DSH evaluators' reports on Garland.

Dr. Abbott testified that Garland did not suffer from a diagnosed mental disorder under the SVPA. He opined that Garland previously suffered from adult antisocial behavior disorder, a disorder similar to—but distinct from—ASPD. He admitted Garland had displayed behavioral problems and verbal outbursts since his admission to the state hospital, but he testified their declining frequency and severity indicated the adult antisocial behavior disorder had remitted. According to Dr. Abbott, Garland also had a stimulant use disorder in the past, but it had remitted as well.

Dr. Abbott considered the possibility Garland suffered from ASPD, but rejected the diagnosis. He did not believe Garland exhibited symptoms of ASPD before he reached the age of 15—a prerequisite for an ASPD diagnosis.

13

He also opined that Garland's relatively advanced age (he was 68 years old at trial) and the reduced severity and frequency of his outbursts at the state hospital suggested his ASPD had remitted, if it ever existed.

In his most recent evaluation, Dr. Abbott did not consider whether Garland suffered from other specified paraphilic disorder, sexual attraction to nonconsenting persons, because he did not believe it was a valid diagnosis. Dr. Abbott claimed it was not a valid diagnosis because it "cannot be established as a categorical diagnosis," and some research suggested that clinicians err more often than not when they give the diagnosis. He also testified that numerous factors cause a person to commit nonconsensual sexual acts, so a pattern of nonconsensual sexual activity does not necessarily support a diagnosis of other specified paraphilic disorder.

Dr. Abbott testified that Garland did not pose a high or serious risk of committing sexually violent predatory acts without treatment or custodial confinement. He assessed Garland with the Static-99R and gave him a score of five. Unlike the prosecution experts, Dr. Abbott selected a routine correction reference group, rather than a high risk/need reference group, to assess whether Garland's score showed he was likely to reoffend. Dr. Abbott testified the five-year recidivism rate for individuals from the routine correction reference group is 12.8 percent, lower than the recidivism rate for the reference group selected by the prosecution experts. According to Dr. Abbott, even this figure overstates the recidivism risk for offenders who are over the age of 60, like Garland, because the figure reflects the average recidivism risk for *all* offenders aged 18–84. Dr. Abbott stated the five-year recidivism rate for offenders who fall within the routine correction reference and are also over the age of 60 is a mere 6.7 percent.

14

### 4. *Testimony of Dr. Korpi*

Dr. Korpi is a forensic psychologist who has performed sexually violent predator evaluations for the DSH for 20 years. He has completed about 1,500 sexually violent predator evaluations.

Dr. Korpi interviewed Garland three times, completed a sexually violent predator evaluation for him in 2010, and updated the evaluation in 2012, 2015, 2019, 2020, 2021, and 2022. In his initial evaluation, Dr. Korpi found Garland satisfied the sexually violent predator criteria. However, Dr. Korpi later changed his opinion and testified at trial that Garland no longer satisfied the sexually violent predator criteria.

Dr. Korpi diagnosed Garland with three disorders—other paraphilic disorder, with nonconsenting or sadistic traits; ASPD; and amphetamine use disorder—and testified the paraphilic disorder, combined with the ASPD, constituted a diagnosed mental disorder under the SVPA. His diagnoses and determination that Garland suffered from a diagnosed mental disorder never changed after the initial evaluation. At trial, he maintained that Garland "suffers from a sexual disorder," and "[t]here's something wrong with him."

At the time of the initial evaluation, Dr. Korpi found that Garland's diagnosed mental disorder made it likely he would engage in sexually violent and predatory criminal acts if he were released from custody. However, he reversed that opinion in 2014. Dr. Korpi changed his opinion because Garland's Static-99R and Static-2002R scores decreased over time. The scores decreased because Garland was no longer under the age of 60. According to Dr. Korpi, "men over the age of 60 very rarely … rape …. [T]he fact that he was 38 when he committed his last sex offense, and he's 68 [years old now], that's the really salient thing. … [O]lder [people] are less likely to sexually offend with rapists usually topping out at about 60 [years old]." When revising his opinion, Dr. Korpi also relied, to a lesser extent, on the fact

15

that Garland's confrontations at the state hospital decreased in frequency and severity.

     5. *Civil Commitment Order*

On October 7, 2022, the trial court granted the commitment petition. The court announced its ruling orally and memorialized the ruling in a written minute order.

The trial court found the first of the three sexually violent predator criteria was satisfied because Garland suffered a conviction of at least one qualifying sexually violent offense. In particular, he was convicted of rape in 1975, and forcible rape, anal or digital penetration by a foreign object, and forcible oral copulation in 1992.

The court found the second sexually violent predator criteria was met because Garland suffered from two diagnosed mental disorders that predisposed him to commit criminal sexual acts. The court found he suffered from other specified paraphilic disorder, sexual attraction to nonconsenting persons, and ASPD, and the two disorders, working in conjunction, caused him to perpetrate "forcible sex acts against women."

Finally, the court found the third sexually violent predator criteria was satisfied because Garland likely would engage in predatory and sexually violent criminal behavior upon his release from custody. In support of this finding, the court referenced Garland's scores on the diagnostic tools, as well as his verbal and physical altercations at the state hospital, his refusal to participate in sex offender treatment, his strength and vitality for a man of his age, his lack of remorse for his crimes, and the predatory nature of his crimes.

III

DISCUSSION

A. *Substantial Evidence Supported the Civil Commitment Order*

Garland challenges the sufficiency of the evidence supporting the commitment order.  He claims there was insufficient evidence to support two of the court's findings—(1) its finding he suffered from a diagnosed mental disorder that made him a danger to the health and safety of others; and (2) its finding that, as a result of his diagnosed mental disorder, he is likely to engage in sexually violent criminal behavior outside of custody.  As we shall explain, substantial evidence supported both of these findings.

1. *Standard of Review*

We apply the substantial evidence standard of review when assessing the sufficiency of the evidence supporting a sexually violent predator commitment order.  (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088.) " '[W]e review the entire record in the light most favorable to the [order] to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant [a sexually violent predator] beyond a reasonable doubt.' [Citation.]  Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the order]." ' " (*People v. Orey* (2021) 63 Cal.App.5th 529, 561 (*Orey*).)

"We 'must presume in support of the [order] the existence of every fact the trier could reasonably deduce from the evidence.' … '[A]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the [order] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute

17

our evaluation of a witness's credibility for that of the fact finder.' [Citation.] This is true even in the context of expert witness testimony. 'The credibility of the experts and their conclusions [are] matters [to be] resolved ... by the [trier of fact],' and '[w]e are not free to reweigh or reinterpret [that] evidence.' " (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 518.)

### 2. *Substantial Evidence Supported the Court's Finding That Garland Suffered from a Diagnosed Mental Disorder*

To satisfy its burden of proof, the prosecution was required to prove, among other elements, that Garland had a diagnosed mental disorder that made him a danger to the health and safety of others. (§§ 6600, subd. (a), 6604.) The SVPA defines a diagnosed mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) The trial court found Garland had a diagnosed mental disorder because he suffered from other specified paraphilic disorder, sexual attraction to nonconsenting persons, as well as ASPD, and the two disorders, working in conjunction, predisposed him to commit sexually violent criminal behavior. Ample evidence supported the court's well-founded finding.

At trial, three of the four expert witnesses—prosecution experts Dr. Goldberg and Dr. Longwell, and defense expert Dr. Korpi—testified that they diagnosed Garland with other paraphilic disorder, sexual attraction to nonconsenting persons, and ASPD. All three experts testified that the disorders, operating in tandem, satisfied the diagnosed mental disorder requirement of the SVPA.

According to Dr. Goldberg, the disorders affected Garland's volitional and emotional capacities. In reaching this conclusion, Dr. Goldberg emphasized that Garland committed multiple forcible sex acts over several

18

decades, he committed the crimes while on parole under the threat of incarceration, he disregarded the pain and suffering of his victims to satisfy his sexual urges, he committed the crimes even though he claimed to have had consensual sexual partners available to him, he refused any mental health treatment for the disorders from which he suffered, he minimized his culpability for his past criminal behavior, and he continued to exhibit impulsive and aggressive behavior at the state hospital.

Similarly, Dr. Longwell said Garland was "emotionally and violently impaired by his diagnosed mental disorder," and his "strong internal desire to force himself sexually on women" outweighed all other considerations. She testified that Garland's perpetration of forcible sex crimes while he was on parole showed his "internal drive to brutally" and "violently" force himself on female strangers overrode his sense of "self-protection." She also opined that his ASPD limited his ability to foster "prosocial traits … like guilt, remorse, compassion, [and] fear of punishment," which might otherwise have prevented him from acting on his "dangerous and deviant criminal urges."

Defense expert Dr. Korpi agreed with the prosecution experts in their diagnoses. He stated, "it was mostly the paraphilia that was the cause for [Garland] being unable to properly empathize and control himself. … The main thing is the paraphilia. The antisocial sort of feeds it a little bit, but primarily it's the paraphilia." Dr. Korpi added, "he can throw the empathy out the window and easily transgress against women, especially when he's high. … [M]ultiple arrests for sexual offending tells me that there's something wrong with his self-control, that he can't help himself. Even though he doesn't want to do it, doesn't want to go to prison … he just can't stop himself." Dr. Korpi stated Garland is "gonna like rape until the day he dies."

19

On appeal, Garland challenges the trial court's finding that he suffered from a diagnosed mental disorder on the ground that other specified paraphilic disorder, sexual attraction to nonconsenting persons, is not a "valid diagnosis." To support this argument, Garland cites the testimony of Dr. Abbott, who opined that a diagnosis of other specified paraphilic disorder, sexual attraction to nonconsenting persons, is not "valid" because it is not a "categorical diagnosis" and clinicians often err making the diagnosis.

However, all of the other experts expressly or implicitly disagreed with Dr. Abbott on this issue. For example, Dr. Longwell stated, "it is a valid diagnosis." She testified the disorder had appeared in the Diagnostic and Statistical Manual of Mental Disorders (DSM), a manual published by the American Psychiatric Association, and it is the most common diagnosis for sexually violent predators who target postpubescent or adult victims.[5] Further, she testified it "flies against [a] long history of sex offense research and treatment" to suggest it is invalid. Dr. Goldberg similarly testified that it is a valid diagnosis. He noted it is a "prevalent" condition and "certainly people who have treated it and evaluated it have seen it occur many times." The trial court, as the trier of fact, "was entitled to accept this testimony and reject Abbott's … testimony to the contrary." (*Orey, supra*, 63 Cal.App.5th at p. 562; see *Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 480 (*Davis*) ["it is for the [trier of fact] to resolve the conflict between … competing expert opinions"]; see also *Johnson, supra*, 235 Cal.App.4th at p. 92 [denying habeas relief to defendant who challenged commitment with expert declaration that merely sharpened conflict about whether paraphilic coercive disorder was legitimate diagnosis].)

---

[5] A condition may qualify as a diagnosed mental disorder under the SVPA irrespective of whether it is listed in the DSM. (*People v. Johnson* (2015) 235 Cal.App.4th 80, 92 (*Johnson*).)

Next, Garland contends there was insufficient evidence to support the court's finding because all three experts who diagnosed him with other specified paraphilic disorder, sexual attraction to nonconsenting persons, allegedly did so based solely on his past criminal behavior. The SVPA "precludes commitment based *solely* on evidence of … prior [sexually violent] crimes." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1164, italics added (*Hubbart*).) However, "past criminal conduct serve[s] an important evidentiary function in establishing the dangerous mental impairments of sex offenders like [Garland]." (*Id.* at p. 1157; see *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1289 ["past qualifying sex crimes are used as evidence in determining whether the person is an SVP"].)

Here, the experts permissibly relied on several factors—not solely Garland's crimes—when they diagnosed him. Dr. Goldberg relied on Garland's pattern of committing sex crimes against women, but also the fact he used excessive force to accomplish the crimes, the fact he committed the crimes despite claiming he had consensual sexual partners available to him, his ongoing denial of responsibility for the crimes, his lack of remorse for the crimes, his refusal to participate in mental health treatment, and his string of verbal outbursts and physical assaults at the state hospital—all of which Dr. Goldberg gleaned from his interview with Garland and his review of the documentary record. In formulating her diagnosis, Dr. Longwell considered many of these same factors and further emphasized that Garland perpetrated his crimes while on parole despite the threat of incarceration. These diagnoses—which were based on several factors, not only Garland's history of violent sex crimes—amply supported the court's finding that he suffered from

21

other specified paraphilic disorder, sexual attraction to nonconsenting persons.[6]

Finally, Garland suggests it is impermissible for a court to rely solely on evidence a defendant suffers from ASPD as the basis for a diagnosed mental disorder finding. We need not address this inapposite argument because the trial court based its finding of a diagnosed mental disorder on expert testimony that Garland suffered from *both* specified paraphilic disorder, sexual attraction to nonconsenting persons, *and* ASPD.

Viewing the evidence in favor of the civil commitment order, we conclude the expert testimony just discussed constituted substantial evidence that Garland had a diagnosed mental disorder that made him a danger to the health and safety of others. (See *People v. Williams* (2003) 31 Cal.4th 757, 760, 778 ["[N]o rational jury could have failed to find [defendant] harbored a mental disorder" where "expert witnesses testified that defendant suffer[ed] from paraphilia, a serious, incurable mental disorder"]; *Johnson, supra*, 235 Cal.App.4th at pp. 90–91 [commitment order properly based on diagnosis of paraphilia, not otherwise specified, with non-consenting persons].)

3. *Substantial Evidence Supported the Court's Finding That Garland Likely Would Engage in Sexually Violent Behavior*

To obtain a civil commitment, the prosecution was also required to establish that Garland was likely to commit sexually violent predatory behavior upon his release from custody. (§ 6600, subds. (a), (e); *People v. Hurtado* (2002) 28 Cal.4th 1179, 1181–1182.) " 'Likely,' in this context, does not mean more likely than not; instead, the standard of likelihood is met 'when "the person presents a *substantial danger*, that is, a *serious and well-*

---

6    Dr. Korpi did not elaborate on the basis for his diagnosis, but opined that Garland "suffers from a sexual disorder. He's not like you and I. There's something wrong with him. He likes women when they are squirming …."

*founded risk*, that he or she will commit such crimes if free in the community." ' " (*People v. Shazier* (2014) 60 Cal.4th 109, 126.) The trial court found the prosecution proved this element beyond a reasonable doubt. Substantial evidence supported this finding as well.

At trial, both prosecution experts, Dr. Goldberg and Dr. Longwell, testified that Garland likely would engage in sexually violent predatory behavior without treatment or custodial confinement. Dr. Goldberg testified, "all the data … points to the conclusion that he's a serious [and] well founded risk to [commit] another sexually violent predatory offense without appropriate treatment and custody." Dr. Longwell testified, "there is no doubt [he] would be a serious and well-founded risk" of danger if he were released into the community.

Like his challenge to the court's diagnosed mental disorder finding, Garland claims the evidence was inadequate to support the court's dangerousness finding because the prosecution experts purportedly relied on Garland's past crimes, standing alone, to formulate their opinions. The record proves otherwise. It shows the experts based their opinions, *in part*, on Garland's criminal history. According to Dr. Goldberg, Garland presented a well-founded risk of danger because he "ha[d] a pattern of raping women … he's been dealing with this life long." He added, it "stands to reason that if [his] prior crimes were predatory, any future ones [would be] predatory as well." Dr. Longwell also opined, "he's likely to commit future predatory sex offenses because that has been his pattern in the past." The experts properly considered Garland's history of perpetrating violent predatory sex crimes against women as one factor, among others, relevant to his risk of danger. (See § 6600, subd. (a)(3) ["Conviction of one or more [sexually violent] crimes … shall constitute evidence that may support a court or jury determination

23

that a person is a sexually violent predator"]; *Hubbart, supra*, 19 Cal.4th at p. 1164 [" ' "[p]revious instances of violent behavior are an important indicator of future violent tendencies" ' "]; *People v. White* (2016) 3 Cal.App.5th 433, 451 [court properly found defendant was likely to commit sexually violent crimes, in part, due to his "unrelenting history" of perpetrating such acts].)

However, the prosecution experts relied on far more than Garland's criminal history alone. Both experts tested Garland with an extensive battery of actuarial instruments intended to measure his recidivism risk, including the Static-99, the Static-2002R, the SORAG, the VRAG-R, and the SRA-FV. On every test, his scores indicated he had a high or above-average recidivism risk. He received these high and above-average scores even though many of the instruments incorporated his relatively advanced age into their overall risk calculi. In other words, his scores reflected a high or above-average risk of recidivism notwithstanding the fact that his age significantly lowered his scores from what they otherwise would have been if age had been omitted as a mitigating factor. As Dr. Goldberg explained, "for somebody like Mr. Garland, who is in his late 60s, [it] is unusual to have such a high score" on these actuarial instruments. Garland's scores on these diagnostic tools strongly supported the court's finding that he likely would engage in sexually violent criminal behavior upon his release. (*Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876 ["The likelihood of a defendant to reoffend is generally established by expert testimony, which is usually based on the use of diagnostic tools, such as the Static-99, to predict future violent sexual behavior."]; see, e.g., *Orey, supra*, 63 Cal.App.5th at p. 562.)

The experts also based their opinions, in part, on Garland's outright refusal to participate in sex offender treatment during his commitment.

Dr. Goldberg testified there is "a moderate decrease in [recidivism] risk[] if [the patient] complete[s] … a sex offender treatment program. … [I]t can decrease [recidivism] by up to a third."  But, as Dr. Goldberg explained, Garland "has not received any treatment to address those issues.  He's refused treatment."  Dr. Longwell likewise based her opinion, in part, on the fact Garland "never joined a sex offender treatment program," even though a program has been "free and available to him" at the hospital "and he's [been] perfectly capable of participating in and completing [it]."

Further, the experts reasonably predicted that Garland would not likely participate in sex offender treatment outside of custody.  According to Dr. Goldberg, Garland "does not believe he has a problem," and he even stated "he had no intentions of pursuing voluntary treatment."  Dr. Goldberg testified that a person cannot "get very far in treatment if [the person] just minimiz[es] [his or her] responsibility," yet Garland "continues to deny responsibility for these crimes."  Dr. Longwell similarly noted that Garland "said [he] [is] not ever joining [treatment], [he] [is] not going to do that, [he] [does not] need to do it."  "An SVPA defendant's refusal to participate in any phase of treatment supports a finding that the defendant would not be able to control his dangerous behavior by voluntary means if released into the community."  (*Orey, supra*, 63 Cal.App.5th at p. 563; *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 929 ["it would be reasonable to consider [a] person's refusal to cooperate in any phase of treatment provided by the Department … as a sign that the person is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community"]; *People v. Hoffman* (2021) 61 Cal.App.5th 976, 978 [affirming commitment order for 74-year old defendant who "declined treatment for 20 years and [did] not think that he need[ed] treatment"].)

25

The experts also based their opinions, in part, on Garland's extensive history of verbal outbursts and physical confrontations at the state hospital. As Dr. Goldberg explained, Garland "continues to be aggressive, both verbally and physically at the hospital." Dr. Longwell testified the verbal outbursts showed "he doesn't cope with any kind of challenging or stressful situation except by being menacing," which "made him a risk to re-offend." She also testified his misbehavior, which was sometimes directed to female staff members, evinced a hostility and aggression towards women. According to Dr. Longwell, "[h]ostility towards women has been shown to be a risk factor in sexual recidivism …." These acts of aggression, misbehavior, and lack of impulse control further corroborate the court's finding that Garland likely would engage in predatory acts of sexually violent criminal behavior if he were released from custody. (See *Orey, supra*, 63 Cal.App.5th at p. 562 [evidence supported commitment order where defendant "engaged in several acts of unruly and aggressive behavior [and] violated hospital rules"].)

Moreover, " '[w]e cannot overlook the significance of defendant's refusal to be interviewed by either of the state's experts' " after his initial interviews with them in 2015. (*Orey, supra*, 63 Cal.App.5th at p. 563, quoting *People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.) "The law has a strong interest in seeing to it that litigants do not manipulate the system, especially where to hold otherwise would permit them to ' "trifle with the courts." ' [Citations.] Here, defendant fully cooperated with his own psychologist, while denying the People's doctors the opportunity to interview him [for their updated evaluations] …. A sex offender cannot deny the state access to the workings of his mind and then claim a lack of proof that he has a 'current' psychological disorder." (*Ibid.*) Garland's "refusal to meet with [Goldberg] and [Longwell]

26

constitutes evidence that [Garland] remained a sexually violent predator at the time of trial." (*Orey,* at p. 563.)

Notwithstanding all of this evidence, Garland faults the prosecution experts for giving insufficient consideration to his supposed "good behavior" and the fact he did not "display aggressive sexual tendencies" at the state hospital.  However, as the prosecution experts persuasively explained, it is neither surprising nor especially relevant that Garland did not engage in sexually violent behaviors at the state hospital because the hospital was a highly controlled environment.  " 'The fact that defendant has not misbehaved in a [sexually violent manner in a] strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others.' " (*Orey, supra*, 63 Cal.App.5th at p. 563, quoting *Sumahit, supra*, 128 Cal.App.4th at p. 353.)  In any event, it is not our role to reweigh the evidence and second-guess the credibility determinations of the trial court, which credited the testimony of the prosecution experts—not the defense experts—on the issue of whether Garland was likely to reoffend outside of custody.  (*Orey,* at p. 562; *Davis, supra*, 245 Cal.App.4th at p. 480.)

For all these reasons, we reject Garland's sufficiency of the evidence claim.  Instead, viewing the evidence in the light most favorable to the commitment order, we conclude there was substantial evidence to support the trial court's finding that he likely would engage in future predatory acts of sexually violent criminal behavior if he were released from custody.

B. *Garland Has Not Proven That the Trial Court Improperly Received Hearsay Testimony into Evidence*

Next, Garland contends the trial court prejudicially erred by admitting hearsay documents and allowing the prosecution's expert witnesses to relate case-specific hearsay in violation of state law.  For reasons we shall explain, Garland has failed to establish prejudicial error.

## 1. *Additional Information*

Prior to trial, Garland filed a motion in limine to exclude expert testimony relating case-specific hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), subject to applicable hearsay exceptions. The trial court granted the motion at a pretrial hearing. It provided a lengthy recitation of case law applying hearsay principles in sexually violent predator commitment proceedings, then noted, "case-specific hearsay cannot be presented through … expert witnesses at trial alone without introducing or admitting into evidence the criminal, juvenile, and Department of State Hospital records" on which the expert testimony is based. Further, because the parties consented to a bench trial, in lieu of a jury trial, the court stated it would "disregard inadmissible evidence" under *People v. Presley* (2021) 65 Cal.App.5th 1131 (*Presley*).[7]

At the same pretrial hearing, the defense requested that its "in limine motions … be deemed continuing objections throughout the trial." Defense counsel stated, "[I]f I don't actually object during the trial, it's because I'm relying upon … the in limine motions …." In response, the court stated, "[T]he objections to my rulings will be considered to be active throughout the entire trial …. [The] objections need not be verbalized. I'll consider them continuing objections such that they will always be objections as to any ruling … further objections would be futile."

Thereafter, the discussion turned to the parties' proposed exhibits. Defense counsel referenced Garland's "mental health treatment records" and stated, "there may be case-specific hearsay … in those records. … I believe

---

7    The reporter's transcript from the pretrial hearing suggests the prosecution filed a motion in limine overlapping to some extent with the defense's motion in limine. However, Garland has omitted the prosecution's motion in limine from the record.

28

the Court is going to need to pare it down to what's competent and admissible evidence versus case-specific hearsay. … I would ask that before the People just admit any mental health treatment records of Mr. Garland at Coalinga, that we come to an understanding of what's going to come in and what's not going to come in and that eventually [will] be addressed." The court replied, "my plan is that as we go through the trial, there may be information from the records that is properly admissible, and only that will be coming in, not any other inadmissible information from the records. But the fact that the records are all coming in, it's to substantiate what the experts would be testifying [to] … without going through a fine-tooth comb of the record."

Next, the prosecution presented arguments why many of the 23 exhibits on its proposed exhibit list fell within a hearsay exception. It argued the police reports for the qualifying offenses (exhibits 1 and 8), certified prior packets for the qualifying offenses (exhibits 2 and 9), certified Penal Code section 969b records (exhibits 4 and 10), a certified statement identifying Garland's dates of incarceration in Ohio (exhibit 5), and certified RAP sheets (exhibits 7 and 11) were admissible to prove the qualifying offenses and fell within the prior conviction hearsay exception in section 6600.[8] The prosecution asserted that redacted versions of sexually violent predator evaluations authored by non-testifying DSH evaluators (exhibits 12, 13, 16, and 17) fell within hearsay exceptions for business records (Evid. Code, § 1271) and official records (*id.*, § 1280), and any statements from Garland

---

[8]     Section 6600, subdivision (a)(3) states, "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals."

documented therein were party admissions (*id.*, § 1220). It claimed various DSH records, including special incident reports (exhibit 14), interdisciplinary notes (exhibit 15), and treatment notes and records (exhibits 18 and 19) likewise fell within the business and official records exceptions. Finally, the prosecution asserted its CDs containing unredacted versions of Garland's sexually violent predator evaluations (exhibit 21) and the complete catalogue of his DSH records (exhibit 22) were partially admissible under the business and official records exceptions, but were being provided subject to *Sanchez* and any hearsay objections for the "limited purposes" of providing a "backstop" for any evaluator witnesses' references "to non-hearsay or hearsay with an exception …."[9]

After the prosecution presented these arguments, the court admitted the exhibits "as a backstop to any case-specific facts that the experts would be testifying to … only to that extent." Later on, the court stated it would also receive the defense's exhibits "under *Presley*." The court added, "I'll receive them under *Presley* just as I would most likely receive the prosecution's [sexually violent predator evaluation] reports under the same case. As I mentioned, the extent of the admissibility of the various items of evidence in the report would be subject to the various laws we have discussed and the cases you mentioned and the defense has mentioned."

2. *Legal Principles*

Hearsay evidence is statutorily defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is

---

[9]     The prosecution stated it intended to rely on certified prior packets (exhibits 3 and 6) to prove Garland's non-qualifying offenses, but did not specify a hearsay exception for the admission of the exhibits. Further, it indicated without elaboration that exhibits 20 and 23 consisted of records from the CDCR.

offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) In other words, "a hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true. Hearsay is generally inadmissible unless it falls under an exception." (*Sanchez, supra*, 63 Cal.4th at p. 674.)

"Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain. Documents may also contain multiple levels of hearsay. An emergency room report, for example, may record the observations made by the writer, along with statements made by the patient. If offered for its truth, the report itself is a hearsay statement made by the person who wrote it. Statements of others, related by the report writer, are a second level of hearsay. Multiple hearsay may not be admitted unless there is an exception for each level." (*Sanchez, supra*, 63 Cal.4th at pp. 674–675.)

Unlike lay witnesses, who may only testify about matters within their personal knowledge, expert witnesses "may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Sanchez, supra*, 63 Cal.4th at p. 675.) "When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (*Ibid.*) "The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise," even though the expert's testimony about his general knowledge is technically hearsay. (*Id.* at p. 676.) "By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent

31

knowledge.  Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*)

While the treatment of expert testimony as to general background information and case-specific hearsay "differed significantly" at common law, "the line between the two … blurred" over time through the creation of common law exceptions and the enactment of the Evidence Code in 1965. (*Sanchez, supra*, 63 Cal.4th at p. 678.)  Relevant here, Evidence Code section 801 provides that an expert witness generally may testify "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert* in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b), italics added.)  Similarly, Evidence Code section 802 provides, in part, that an expert generally "may state on direct examination the reasons for his opinion *and the matter* (including, in the case of an expert, his special knowledge, skill, experience, training, and education) *upon which it is based*." (Italics added.)  In other words, "in support of his opinion, an expert is entitled to explain to the jury the 'matter' upon which he relied, even if that matter would ordinarily be inadmissible." (*Sanchez,* at p. 679.)

With these legal principles in mind, courts adopted a longstanding practice of allowing expert witnesses to relate case-specific hearsay to the jury, so long as the jury was instructed it could only consider the evidence to explain the basis of the expert's opinion and not for its truth.  (See *People v. Bell* (2007) 40 Cal.4th 582, 608, overruled by *Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13; *People v. Montiel* (1993) 5 Cal.4th 877, 918–919, overruled by *Sanchez*, at p. 686, fn. 13.)  This practice eliminated the "need to carefully

distinguish between an expert's testimony regarding background information and case-specific facts.  The inquiry instead turned on whether the jury could properly follow the court's limiting instruction in light of the nature and amount of the out-of-court statements admitted." (*Sanchez,* at p. 679.)

However, the *Sanchez* decision upended the practice of admitting not-for-the-truth evidence.  In *Sanchez*, the Supreme Court parted from its precedent and concluded that, "[w]hen an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth.  In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement." (*Sanchez, supra*, 63 Cal.4th at pp. 682–683; see also *id.* at p. 684 ["If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay."].)  Thus, post-*Sanchez*, an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. … [¶] What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at pp. 685–686.)

" 'We review the trial court's determination as to the admissibility of evidence, including the application of exceptions to the hearsay rule, for an abuse of discretion.' " (*Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 610.)  Under that standard, our task is to determine whether the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner.  (*Ibid.*)  "Even if a trial court abuses its discretion in admitting hearsay evidence, we do not reverse unless there is a reasonable probability

33

the defendant would have achieved a more favorable result absent the out-of-court statement." (*People v. Lozano* (2024) 101 Cal.App.5th 366, 381–382.)

### 3. *Application*

Garland mounts two related challenges to the trial court's evidentiary rulings, attacking both the court's admission of the prosecution's exhibits and its ruling allowing the prosecution's expert witnesses to relate case-specific hearsay to the court, subject to *Presley, supra*, 65 Cal.App.5th 1131.

We begin with Garland's attacks on the trial court's exhibit rulings. Our discussion of this issue will be brief, given that Garland does not support his surface-level challenge to the court's evidentiary rulings with cogent legal analysis or citations to the appellate record. At times, he simply makes sweeping and conclusory claims that the prosecution's exhibits were "inadmissible," with little or no additional detail.[10] At other times, he equivocally suggests some of the exhibits might have been—or might not have been—admissible, but then leaves the line-drawing unresolved and open for debate.[11] And at other times, he claims exhibits were hearsay (or they contained multiple levels of hearsay), but then provides no specific citations to the record for each alleged instance of hearsay and no discussion

---

[10] For instance, Garland broadly claims, "the prosecution did not prove [its] documents were admissible under hearsay exceptions." Similarly, he asserts in conclusory fashion that the testifying experts' "reports, other non-testifying doctor's [sic] reports, and [other] documents … were not admissible under an exception to the hearsay rule."

[11] By way of example, Garland claims, "[m]ost of the [exhibits] [did] not qualify as business or government records. … Any part of a document that does not fit all the requirements [of a hearsay exception] is inadmissible."

about the hearsay exceptions that were invoked in the trial court to obtain the admission of the exhibits despite their hearsay character.[12]

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.  Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record.  [Citations.]  Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 598; see *Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694, fn. 1 ["it is manifestly 'the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing *exact page citations*' "]; Cal. Rules of Court, rule 8.204(a)(1)(C) [an appellant must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)  Accordingly, we

---

[12]  To take one example, Garland argues exhibits 12–19 "were replete with multiple layers of hearsay," but then fails to provide any record citation to support his claim or any discussion of the hearsay exceptions the prosecution relied upon in the trial court to admit the exhibits.  Similarly, he asserts exhibits 14 and 15 "contained multiple levels of hearsay," without supplying any record citations or analysis of potentially applicable hearsay exceptions.

disregard Garland's conclusory, undeveloped, and unsupported arguments describing the prosecution's exhibits as "hearsay" or "inadmissible."[13]

Garland's challenge to the admission of expert testimony relating case-specific hearsay fares no better. As noted, the court granted the defense's motion in limine to exclude expert testimony relating case-specific hearsay. However, because the case proceeded as a bench trial, rather than a jury trial, the court stated it would "disregard" inadmissible expert testimony under *Presley, supra*, 65 Cal.App.5th 1131. Shortly after, the court added, "there may be information from the records that is properly admissible, and only that will be coming in, not any other inadmissible information from the records."

In *Presley*, the defendant appealed an SVPA civil commitment order on the basis that the trial court allowed the prosecution to elicit case-specific hearsay from its expert witnesses in violation of the legal principles set forth in *Sanchez*. (*Presley, supra*, 65 Cal.App.5th at p. 1135.) The trial court granted a defense motion to exclude otherwise-inadmissible case-specific hearsay related by expert witnesses, but ruled that it would differentiate between admissible and inadmissible evidence as the evidence came in because the proceeding was a court trial, not a jury trial. (*Ibid.*) The Court of Appeal concluded the trial court did not abuse its discretion. (*Id.* at p. 1141.)

---

13    The closest Garland comes to mounting a cogent challenge is his claim that certain "DSH records"—which ones, we do not know—fell outside the business or public records hearsay exceptions because they were prepared in anticipation of litigation. However, this argument is likewise forfeited because Garland did not assert this specific objection in the trial court. (*People v. Nelson* (2012) 209 Cal.App.4th 698, 709–711 [defendant forfeited challenge to admission of state hospital interdisciplinary notes by failing to interpose specific objection to records, which prosecution offered under business and public records hearsay exceptions].)

The *Presley* court observed, " ' " 'A trial judge hears many items during the course of a trial which are inadmissible, and [s]he is called upon to rule on the admissibility of numerous evidentiary matters.  The fact that [s]he has heard these things does not mean that [s]he cannot divorce them from [her] mind.' [Citations.]" [Citation.]  " 'As an aspect of the presumption that judicial duty is properly performed [citation], we presume ... that the court knows and applies the correct statutory and case law [citation] and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may be considered in the judicial decisionmaking process.' [Citation.]  Stated another way, a trial court is presumed to ignore material it knows is incompetent, irrelevant, or inadmissible." [Citation.]  "Only proof that the evidence actually figured in the court's decision will overcome these presumptions.  [Citations.]  Clearly, the mere fact that the court heard or read the evidence is not sufficient to overcome the presumptions." ' " (*Presley, supra*, 65 Cal.App.5th at pp. 1142–1143, quoting *Hayward v. Superior Court* (2016) 2 Cal.App.5th 10, 60–61.)

The *Presley* court concluded the defendant appearing before it did not defeat the presumption the trial court ignored inadmissible expert testimony.  The *Presley* court emphasized that, "[i]n explaining its [commitment] determination, the trial court did not reference any of the inadmissible case-specific facts defendant challenges on appeal." (*Presley, supra*, 65 Cal.App.5th at p. 1143.)  Further, it noted that the expert testimony "drew on multiple sources of information, not solely the case-specific facts that defendant challenges on appeal." (*Ibid.*)  In sum, the *Presley* court held that the mere fact "the trial court may have *heard* inadmissible case-specific hearsay regarding defendant [did] not overcome the presumption that the trial court applied *Sanchez* and properly ignored such material." (*Ibid.*)

37

*Presley* is controlling here.  Like the trial court in *Presley*, the trial court in this case granted a pretrial defense motion to exclude expert testimony relating case-specific hearsay, but indicated it would receive the testimony and disregard inadmissible evidence.  Like the experts in *Presley*, the prosecution experts in this case interviewed the defendant and based their expert opinions on multiple sources of information, not solely the case-specific hearsay challenged on appeal.[14]  Further, like the *Presley* defendant, Garland does not direct us to any inadmissible case-specific information in the trial court's commitment ruling.  Like *Presley*, "nothing in the record dispels the presumption the trial court ignored material it knew was inadmissible under *Sanchez*." (*Presley, supra*, 65 Cal.App.5th at p. 1141.)[15]

---

[14]  Garland states the prosecution experts relied "*solely* on [their] … document review" to form their opinions.  He is incorrect.  Dr. Goldberg and Dr. Longwell interviewed Garland in 2015 and testified extensively about their interviews at trial.

[15]  At times, Garland describes the admitted exhibits as "cumulative," "duplicative," and "repetitive" of other evidence, and "excessive" and "inflammatory" due to their voluminous nature.  It is unclear whether Garland maintains that the trial court erred insofar as it declined to exclude the exhibits under Evidence Code section 352.  However, to the extent he purports to make such a claim, it is without merit. (See *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1481 [Evid. Code, § 352 "concerns probative value being substantially outweighed by danger from 'undue prejudice' or 'confusing the issues' or 'misleading the jury' [citation]—dangers which a court trial either minimizes or, in the case of jury confusion, cannot pose"]; see also *Houghtaling v. Superior Court* (1993) 17 Cal.App.4th 1128, 1138 ["the rules of evidence are commonly relaxed in court trials, a practice which reflects a recognition that judges are—and must be—trusted to treat questionable evidence in a fair and rational manner"].)

C. *Garland Has Not Demonstrated That the Trial Court Erred by Limiting Expert Testimony Regarding the So-Called Padilla "Study"*

Next, Garland contends the trial court prejudicially erred by precluding his expert witness, Dr. Abbott, from discussing the results of a so-called "study" of sexually violent predator recidivism rates conducted by a former DSH employee, Dr. Jesus Padilla. We reject this argument, as Garland has failed to establish error or prejudice resulting from the alleged error.

1. *Additional Information*

On direct examination, Dr. Abbott testified there was not a serious and well-founded risk Garland would commit sexually violent predatory acts without treatment or confinement. He testified he gave Garland a score of five on the Static-99R, and offenders who fell within the routine corrections reference group and scored a five on the Static-99R had a five-year recidivism rate of 12.8 percent. According to Dr. Abbott, he compared Garland to the routine corrections reference group, not the high risk/need reference group (which had a higher recidivism rate), based in part on research finding that 300 sexually violent predators who were released from custody reoffended at a rate of just 6.1 percent within five years. Dr. Abbott testified that even the five-year recidivism rate of 12.8 percent overstated the danger for offenders over the age of 60, like Garland, because it reflected the recidivism risk for all offenders aged 18 to 84, and recent research suggested the special five-year recidivism risk for offenders over the age of 60 was 6.7 percent. Dr. Abbott also referenced a research paper that found the risk a person will reoffend decreases by two percent each year as the person ages.

After Dr. Abbott discussed this research, defense counsel asked him about his familiarity with a so-called "study" conducted by Dr. Padilla involving the release of 93 sexually violent predators from confinement. The prosecution interposed a foundation objection, noting the Padilla "study" was

39

regularly the subject of Evidence Code section 402 hearings and excluded from evidence in sexually violent predator trials. The trial court stated the Padilla "study" was never peer-reviewed and sustained the objection.

Later, during the cross-examination of prosecution expert Dr. Goldberg, defense counsel asked Dr. Goldberg about his familiarity with the Padilla "study." Dr. Goldberg replied, "Jay Padilla is not a study …. Dr. Abbott brings that report up all the time and Jay Padilla before he died discounted everything that Dr. Abbott has said about that study. So, no, that's not a study. It was just some kind of survey Dr. Padilla did at one time. … But Dr. Abbott … he's been a defense expert on countless cases I've been involved in. It's the same thing he says over and over again. He never finds anybody to meet [the sexually violent predator] criteria and he brings up the same things even though they've been discounted …. But Dr. Padilla is not a study. In fact, it's a survey he did on his own. He realized he didn't count other states and recidivism rates and people who left the state and recidivated, so that wasn't really a valid study. It was never peer reviewed."

Defense counsel then asked Dr. Goldberg whether the Padilla "paper" showed that sexually volent predators who were released into the community reoffended at a rate of 4.3 percent over a five-year period. Dr. Goldberg responded, "Yes. But what I'm saying is that was a paper and it was not peer reviewed, and Dr. Padilla missed some people in that study who recidivated because he didn't have all the data." When defense counsel asked Dr. Goldberg another question about the findings of the Padilla "paper," the prosecution objected and referenced the court's prior evidentiary ruling precluding Dr. Abbott from testifying about the Padilla "paper." The court sustained the objection.

2. *Legal Principles*

"Trial courts have a 'substantial "gatekeeping" responsibility' in excluding unreliable expert testimony. [Citation.] This is to 'ensure that an expert's opinion is based on both reliable material and sound reasoning.' " (*Onglyza Product Cases* (2023) 90 Cal.App.5th 776, 784 (*Onglyza*).)

"Evidence Code section 801 limits expert testimony to opinions that are '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' and '[b]ased on matter ... that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.' [Citation.] Section 802 states that a witness, including an expert, may 'state on direct examination the reasons for his opinion and the matter ... upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion.' In sum, 'Evidence Code section 801 governs judicial review of the *type* of matter; Evidence Code section 802 governs judicial review of the *reasons* for the opinion.' " (*Onglyza, supra*, 90 Cal.App.5th at p. 784, fn. omitted.) In exercising its gatekeeping function, the court " 'conducts a "circumscribed inquiry" to "determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid." [Citation.] The goal of trial court gatekeeping is simply to exclude "clearly invalid and unreliable" expert opinion.' " (*Id.* at p. 785.)

" ' "A trial court's exercise of discretion in ... excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.] It is the appellant's ' "burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason." '

41

[Citation.]  An ' "erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.' " ' " (*K.M. v. Grossmont Union High School Dist.* (2022) 84 Cal.App.5th 717, 760.)

        3.  *Application*

As an initial matter, we reject Garland's argument that the trial court erred when it limited Dr. Abbott's testimony about the so-called Padilla "study."  In his opening brief, Garland states the expert testimony was "admissible" because "Dr. Abbott relied upon the Padilla study, as he did the other studies."  However, Garland articulates no argument concerning the *reliability* of the Padilla "study" on which Dr. Abbott based his opinion, nor does he discuss the court's exercise of its gatekeeping function under Evidence Code sections 801 and 802.  Because Garland bears the burden of proving the evidentiary error, his argument fails on the merits.

Even if we were to assume error, we would conclude it was harmless for several reasons.  First, while the court limited Dr. Abbott's testimony about the Padilla "study," Dr. Abbott discussed the Padilla "study" in the written updated evaluation he prepared for Garland in 2021, which the court admitted into evidence.  Thus, the court already received Dr. Abbott's summary, in his own words, of the Padilla "study."  Second, Dr. Abbott testified at length that, despite Garland's Static-99R score, there was not a serious and well-founded risk he would commit a sexually violent crime upon his release.  In doing so, he discussed numerous research studies and papers to suggest the recidivism rates proffered by the prosecution experts were overstated.  Testimony concerning the Padilla "study" would have been largely duplicative of this evidence.  Third, there was overwhelming evidence Garland likely would engage in future sexually violent predatory acts.  Such evidence included the prosecution experts' testimony about Garland's

actuarial instrument scores, his extensive history of committing violent predatory sexual crimes against women, his refusal to participate in sex offender treatment, his commission of dozens of acts of verbal and physical aggression at the state hospital, and his refusal to sit for interviews with the prosecution experts. For all these reasons, it is not reasonably probable Garland would have obtained a more favorable outcome if the court had admitted the testimony about the so-called Padilla "study."

D. *Garland Has Not Established a Violation of his Speedy Trial Right*

Finally, Garland contends his constitutional right to a speedy trial was violated because twenty years elapsed between his initial probable cause hearing and his commitment trial. In particular, he asserts a speedy trial violation because he "had to sit and wait for twenty years without any benefit [in the hospital] and with the great loss of [his] fundamental liberties."

We are not blind to the fact that the pretrial delay in this case was unusually lengthy. This long delay resulted in a significant restriction on Garland's liberty, given that he was committed to DSH custody for the duration of the pretrial proceedings. Further, the record reveals the prosecution and the court did regrettably little—far too little, in our view—to move the case to trial. However, it was Garland and his defense team that were primarily responsible for this delay, as they sought continuance after continuance from the court and repeatedly asked the court to refrain from advancing the case or setting the matter for trial. Moreover, Garland at no point asserted his right to a timely trial; on the contrary, he expressly waived his right to a speedy trial, time and again. For these reasons, we conclude there was no violation of Garland's right to a speedy trial.

1. *Additional Information*

The trial court found probable cause to support the commitment petition in May 2002. Twenty years then elapsed until trial began—an

43

uncommonly lengthy delay, even by sexually violent predator case standards. For the sake of clarity, we have compartmentalized the case chronology into three periods—(1) the period from May 2002, when the court found probable cause to support the commitment petition, until April 2011, when the court held a new probable cause hearing; (2) the period from April 2011 until March 2020, when COVID-19 related disruptions began to impact the statewide court system; and (3) the period from March 2020 until July 2022, when the trial began.

###### a. *May 2002—April 2011*

For the period from May 2002 to April 2011, the limited appellate record before us reveals little about the case. However, it shows the parties engaged in at least some motion practice during this timeframe. Garland filed a handful of unsuccessful motions, including a motion to dismiss the commitment petition (which the court denied in November 2008), and a motion to quash the prosecution's service of a subpoena duces tecum demanding the DSH produce Garland's mental health records (which the court denied in June 2010).

During this timeframe, Garland also filed one partly successful motion. In March 2010, he filed a *Ronje* motion asking the court to appoint new DSH evaluators, order new evaluations, and hold a new probable cause hearing, all on the ground the initial DSH evaluators evaluated him with an assessment protocol the DSH had adopted in a procedurally improper manner. In June 2010, the court denied his request to appoint new evaluators, but granted his request for new evaluations and a new probable cause hearing.[16]  The

---

16    Garland filed petitions for writs of mandate in our court challenging the denial of his request for new evaluators, which we denied in August and September 2010.  On our own motion, we take judicial notice of the court records in the writ petition proceedings, in Case Nos. D057824 and D057910.

following month, the DSH evaluators conducted new evaluations and found Garland satisfied the sexually violent predator criteria.

In February and April 2011, the trial court held a new probable cause hearing. It again found probable cause supported the commitment petition.

Between May 2002 and April 2011, the trial court granted dozens of continuances at status conferences and other hearings—51 in total, by our count. The court minute orders show the prosecution requested a continuance once, at the first status conference after the probable cause hearing. They disclose the defense, by contrast, requested and obtained numerous continuances. They show the parties jointly stipulated to several additional continuances. The court orders do not specify which party or parties sought the remaining continuances; however, according to the parties' trial court filings, it was the defense—not the prosecution—that asked for the continuances.[17]

   b. *May 2011–March 2020*

In May 2011, the court set a trial date for the first time and scheduled trial for February 2012. In January 2012, the court vacated the trial date for reasons that are not apparent from the record.

In February 2012, the court set a trial readiness conference for August 2012. In July 2012, the court vacated the trial readiness conference for reasons that are unclear from the record. However, the record shows

_____

[17]    In the prosecution's brief in opposition to Garland's motion to quash the subpoena duces tecum, the prosecution stated that, in the eight and a half years that had elapsed since the probable cause hearing, "there [had been] forty-two (42) continuances at the request of the Public Defender's office with no[] trial dates being set." The People make a similar contention in their appellate brief, stating "[a]ll of the continuances were at the request of the defense counsel or joint requests, except for the first request which was made by the People." Garland did not dispute this claim in the trial court and he does not do so on appeal.

that, at the time, the parties were engaged in motion practice pertaining to discovery.

Over the next six years, the defense sought numerous continuances and filed waivers under *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon* waivers), all of which significantly delayed the progression of the case.

In March and April 2013, the defense requested and obtained two continuances of a trial setting conference. The following month, the public defender's office declared a conflict and the conflict panel was appointed to represent Garland.

In June 2013, the court tentatively set the matter for trial in May 2014. However, in July 2013, the defense filed a *Litmon* waiver, which expressly waived Garland's speedy trial right and asked the court to refrain from scheduling hearings or trial for an unspecified number of months, ostensibly so he could seek mental health treatment (which he never did).

In September 2013, the defense filed another *Litmon* waiver, this time requesting that the court refrain from setting hearings or trial for 12 months.

In March 2014, the court vacated the trial date at the joint request of the parties. It also granted two additional continuances of status conferences at the defense's request.

In July 2014, the court set a trial date for January 2015. However, the defense filed another 12-month *Litmon* waiver in August 2014, and obtained additional status conference continuances.

In January 2015, the court vacated the trial date for two reasons—first, the defense required additional time for one of its expert witnesses, Dr. Abbott, to update his evaluation and, second, Dr. Korpi had completed his updated evaluation and concluded Garland no longer satisfied the sexually violent predator criteria. After Dr. Korpi changed his evaluation, the DSH

replaced its evaluators with Dr. Goldberg and Dr. Longwell. Both new evaluators swiftly completed their evaluations and concluded that Garland satisfied the sexually violent predator criteria in March 2015.

In early 2015, the court reset the trial date for September 2015. However, at a status conference in August 2015, the defense stated it wanted to postpone trial until the final resolution of an unrelated sexually violent predator case. The defense filed an additional 12-month *Litmon* waiver in August 2015.

Thereafter, in September 2015, the court vacated the trial date once again. It also granted three status conference continuance requests from the defense in the Fall of 2015 and the Spring of 2016.

In August 2016, the court set a new trial date for April 2017. However, in February 2017, the defense filed another 12-month *Litmon* waiver and the court again vacated the trial date.

In January 2018, the defense filed another 12-month *Litmon* waiver. At a September 2018 status conference, defense counsel informed the court it "hop[ed] to try [the case] by the end of 2019."

In January 2019, the court set the matter for trial in July 2019 at the recommendation of the prosecution.

In May 2019, the court vacated the trial date and reset it for September 2019. It did so at the request of the defense, which sought a further delay to obtain an updated evaluation from Dr. Abbott.

In July 2019, the court vacated the September 2019 trial date, at the request of the defense, to accommodate defense counsel's schedule. The court set a new trial date in October 2019.

In October 2019, the court vacated the trial date and reset it for February 2020 due to defense counsel's unavailability.

In February 2020, the court granted a defense motion to continue the trial readiness conference, delaying the trial yet again. The defense sought a continuance to accommodate Dr. Abbott's schedule.

On March 13, 2020, the court held a status conference. It continued the status conference to May 2020, at the request of the defense, in order to give the parties additional time to obtain updated evaluations for their expert witnesses. At the time, defense counsel stated the defense likely would be prepared for trial in "July or August [2020], realistically."

c. *March 2020–July 2022*

Shortly after the March 2020 status conference, the COVID-19 pandemic emerged as a significant public health crisis statewide, prompting the trial court to continue the status conference to June 2020.

At the June 2020 status conference, the court reset the trial date for September 2020. In August 2020, the court vacated the trial date to permit the defense to obtain updated evaluations from its expert witnesses.

In September 2020, the court reset the trial date for January 2021. However, in December 2020, the court vacated the trial date because jury trials were unavailable due to the COVID-19 pandemic.[18] In February, March, April, May, July, August, and October 2021, the court granted seven additional continuance requests from the defense so that it could obtain updated evaluations from its experts.

In January 2022, the court reset the trial date for April 2022. It reset the trial date for July 2022, and trial ultimately commenced on July 11, 2022.

---

[18] Although the matter ultimately proceeded by way of a bench trial, it was still uncertain at the time whether the case would be tried to a jury.

2. *Legal Principles*

Significant pretrial delays in sexually violent predator commitment proceedings are neither a new nor an uncommon phenomenon. (See *Camacho, supra*, 15 Cal.5th at p. 376.) "The reasons for delay in a given case vary, but certain features of the [SVPA] help to explain why, in general, extended pretrial delays may be more likely to occur in [sexually violent predator] cases than in other cases. As an initial matter, [sexually violent predator] trials, unlike criminal trials and most types of civil trials, are not subject to statutory time limits." (*Id.* at pp. 376–377.)

"More fundamentally, [sexually violent predator] trials are unlike criminal trials in that they are not aimed primarily at establishing an individual's liability for past events, but instead at establishing the individual's present need for mental health treatment. Although [a sexually violent predator] proceeding may involve inquiry into certain facts about an individual's criminal history [citation], the central focus of [a sexually violent predator] trial is whether the individual currently has a mental disorder that poses a danger to the public and thus requires hospitalization [citation]. Once a judge has found probable cause to believe an individual is [a sexually violent predator], that individual is held in a state hospital and begins to receive mental health treatment—even before trial is ever held. [Citation.] … For this reason, both sides may have a common interest in delaying trial. From the individual's perspective, allowing more time for treatment may ultimately improve the chance of success at trial, insofar as treatment may help address a mental disorder that a jury might otherwise find poses a risk to the public. … For the state's part, there are limited incentives to expend the resources necessary to push the case toward trial when, following a finding of probable cause, the individual is already being hospitalized and receiving treatment." (*Camacho, supra*, 15 Cal.5th at p. 377.)

49

While yearslong pretrial delays may be commonplace in sexually violent predator commitment proceedings, that fact alone does not mean they are necessarily constitutional. "The due process clauses of both the federal and state Constitutions forbid the state from depriving individuals of their liberty without due process of law." (*Camacho, supra*, 15 Cal.5th at p. 379.) "Civil commitment under the [SVPA] undoubtedly involves 'a significant deprivation of liberty.' [Citations.] 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." ' [Citation.] Thus, … individuals facing commitment under the [SVPA] have a due process right to a timely trial." (*Ibid.*)

A court confronted with a claim of excessive pretrial delay in a sexually violent predator case should apply the same four-part test that governs claims of speedy trial violations in criminal cases. (*Camacho, supra*, 15 Cal.5th at p. 379.) That framework, derived from *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*), requires the court to examine four factors: "[1] the length of the pretrial delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant caused by the delay." (*Camacho,* at p. 380.) "The defendant carries the 'burden of demonstrating a speedy trial violation under *Barker*'s multifactor test.' [Citation.] Because none of these factors is dispositive, 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Camacho,* at p. 380.)

The Supreme Court recently applied the four-part *Barker* test in *Camacho*, a sexually violent predator case bearing many similarities to the present one. In *Camacho*, the defendant was found to be a sexually violent predator in 2005, and committed to a two-year term under the version of the SVPA that was in place at the time. (*Camacho, supra*, 15 Cal.5th at p. 372.)

In late 2006, a petition was filed to recommit the defendant to an indefinite term under the new version of the SVPA. (*Ibid.*) However, over the ensuing years, the case was continued more than 200 times. (*Ibid.*) In 2015, a doctor evaluated the defendant and concluded, for the first time in the case, that he no longer met the sexually violent predator criteria. (*Id.* at p. 373.) As of the date of the *Camacho* decision, which the Supreme Court issued 17 years after the recommitment petition was filed, trial on the recommitment petition had yet to occur. (*Id.* at p. 368.) Still, the *Camacho* court concluded there was no violation of the defendant's speedy trial right, as the "record show[ed] that responsibility for the delay [laid] primarily with the defense, which either sought or agreed to the continuances that led to the delay." (*Ibid.*)

With respect to the first *Barker* factor, the length of the delay, the court observed the 17-year delay was "not entirely out of line with delays seen in other [sexually violent predator] cases." (*Camacho, supra*, 15 Cal.5th at p. 383.) Nonetheless, the court concluded it was "an exceedingly lengthy delay all the same," thus supporting the defendant's claim of a timely trial violation. (*Ibid.*)

Turning to the second *Barker* factor, the reason for the pretrial delay, the *Camacho* court recognized that the trial court and the prosecution did little to advance the case to trial, and thus bore at least some of the responsibility for the delay. (*Camacho, supra*, 15 Cal.5th at pp. 387–390.) Nonetheless, it held that the defense shouldered primary responsibility for the delay. (*Id.* at pp. 384–387.) The court noted, "virtually all the delays in this case were either sought by the defense or agreed to by the defense, and no continuances were requested solely by the People." (*Id.* at p. 384.)

The *Camacho* court held that the third *Barker* factor, the defendant's assertion of his right to a timely trial, also weighed against a speedy trial

51

violation. (*Camacho, supra*, 15 Cal.5th at pp. 390–391.) In particular, the court observed that the defendant did not demand a trial until late 2018, nearly 12 years after the recommitment petition was filed. (*Id.* at p. 391.)

Finally, examining the fourth *Barker* factor, the *Camacho* court concluded the defendant experienced "some amount of prejudice" from the delay, but such prejudice was "extenuated by the fact that [he] [did] not show[] he in fact wanted a timely trial." (*Camacho, supra*, 15 Cal.5th at p. 393.) Further, the court observed "the delay … had no appreciable impact on [defendant's] ability to present his defense." (*Ibid.*)

Balancing all four *Barker* factors, the *Camacho* court concluded the defendant "fail[ed] to demonstrate a violation of his due process right to a timely trial." (*Camacho, supra*, 15 Cal.5th at p. 393.) "Though the trial court and the state seemingly neglected their responsibility to bring the case to trial in a timely manner," the court determined "that the defense, rather than the state, [bore] more responsibility for the delay. [The defendant] did not demonstrate a desire to go to trial before 2018, nor did he suffer significant prejudice to his case as a result of the delay." (*Id.* at p. 394.)

### 3. *Application*

Applying the four-part *Barker* framework to the facts of the case before us, we conclude Garland has not established that the pretrial delay in the present case violated his due process right to a speedy trial.[19]

#### a. *Factor One: Length of the Delay*

"We begin with the first *Barker* factor, the length of the pretrial delay." (*Camacho, supra*, 15 Cal.5th at p. 383.) Twenty years elapsed between the initial probable cause hearing, which took place in 2002, and the commitment

---

19    Because Garland's claim of a speedy trial violation fails on the merits, we decline to address whether Garland forfeited his speedy trial argument.

trial, which occurred in 2022. As the *Camacho* court noted, a pretrial delay approaching two decades is not significantly out of line with delays observed in other sexually violent predator commitment proceedings. (*Ibid.*) Nonetheless, as the People admit, the delay here was "quite lengthy." The decades-long delay in the present case "unquestionably supports [Garland's] claim of a constitutional timely trial violation." (*Ibid.*)

### b. *Factor Two: Reasons for the Delay*

Turning to the second *Barker* factor, we now examine the reasons for the delay. "This is the 'flag all litigants seek to capture' [citation] because the permissibility of pretrial delay depends to a great extent on who bears responsibility for it and why." (*Camacho, supra*, 15 Cal.5th at pp. 383–384.)

"In analyzing the second factor, courts examine 'whether the government or the criminal defendant is more to blame for th[e] delay.' [Citations.] Courts also examine why the delay occurred, for 'different weights should be assigned to different reasons.' [Citation.] If the government deliberately delays trial to hamper the defense, for instance, that effort at manipulation 'should be weighted heavily against the government.' [Citation.] 'A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.' [Citation.] By contrast, 'if delay is attributable to the defendant, then his waiver [of his right to a speedy trial] may be given effect under standard waiver doctrine.' " (*Camacho, supra*, 15 Cal.5th at p. 384.)

For the time period from May 2002 to April 2011, the record is somewhat sparse. However, even with the limited record before us, there

emerges a common pattern in the parties' filings and court orders. With the exception of the first continuance request, which was filed by the prosecution, in every instance "where the available record identifies the party moving for a continuance, the record shows that it was defense counsel — either alone, or jointly with the People." (*Camacho, supra*, 15 Cal.5th at p. 384.)

These continuance requests from the defense proliferated after the second probable cause hearing and over the next decade, essentially to the point of trial. The defense sought continuances for a variety of reasons—including its claimed need to obtain updated evaluations from its witnesses, its desire to accommodate the schedules of defense counsel and defense witnesses, and the desire to await legal developments in other cases involving commitments under the SVPA. But, in virtually all instances, the continuance requests came from the defense alone. In fact, the defense went one step further, filing *Litmon* waivers that implored the trial court to refrain from setting the trial—or even any further court hearings—for years on end. "On the available record, [Garland] bears most of the responsibility for the delay he now challenges." (*Camacho, supra*, 15 Cal.5th at p. 387.)

In an attempt to refute the notion that he bore primary responsibility for the delay in his case, Garland emphasizes that he did not appear personally or telephonically during many of the court hearings at which his trial counsel requested continuances or discussed his *Litmon* waivers. We are not persuaded. "In general, delays sought by the defendant's counsel weigh against the defendant's claim of a speedy trial violation. [Citation.] This rule flows from the ordinary principle that an ' "attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation," ' such that the client must assume the consequences of the attorney's delay." (*Camacho, supra*, 15 Cal.5th at p. 385.) We apply this

54

ordinary and well-established rule here, as there is no indication in the record that Garland's defense counsel acted against his wishes in requesting the continuances or filing the *Litmon* waivers that Garland himself signed.

Garland also seeks to shift responsibility for the delay to the prosecution, noting that, as early as September 2019, his counsel advised the court that he likely would be willing to waive a jury trial and proceed by way of a bench trial. According to Garland, this supposed offer to waive a jury trial—if it had been embraced earlier by the prosecution—would have removed a potential hurdle to trial by eliminating some of the complications and delays that can arise from jury trials. This argument is unconvincing as well. Although defense counsel equivocally suggested a jury waiver might be possible in September 2019, Garland did not definitively waive a jury trial until May 2022, just two months before the bench trial took place. In any event, even if Garland had gone on the record and affirmatively waived his right to a jury trial earlier, the logistical complexities associated with holding a jury trial were not the cause of any significant delays in this case. Indeed, even after September 2019, the defense continued to request numerous continuances of status conferences, trial readiness conferences, and trial dates for a variety of unrelated reasons.

Finally, Garland observes there was some delay associated with the court closures and other impediments that arose due to the COVID-19 pandemic, which emerged in early 2020. However, any delays associated with the COVID-19 pandemic were minimal. In his reply brief, Garland concedes the point, noting that "the only delay caused by the pandemic … was the first three months when all courts were completely closed." The brief delay associated with the COVID-19 public health crisis does not alter our

conclusion that the two-decade delay in this case, viewed as a whole, was overwhelmingly attributable to the defense.

Although it is abundantly clear from the record the defense was the primary cause of the delay, we cannot ignore that the prosecution seemingly acquiesced to the defense's delay tactics. As the *Camacho* court observed, "permitting [an] alleged [sexually violent predator] to indefinitely delay trial discounts the broader societal interest in timely, definitive decisions about whether individuals satisfy the criteria for involuntary commitment—where commitment necessarily comes at taxpayer expense and carries personal costs for families and communities from whom the individual will remain indefinitely separated." (*Camacho, supra*, 15 Cal.5th at p. 388.) Thus, "the government has a responsibility to ensure the case is moving forward in a manner that is consistent with due process. When faced with unwarranted delays or repeated continuances, 'diligent prosecution of [a sexually violent predator] petition may necessitate objecting to the delays, insisting upon trial deadlines, and making the trial court aware of the length of time since the filing of the [sexually violent predator] petition or other pertinent details from the record.' " (*Ibid.*) In the present case, the prosecution undertook virtually none of these efforts, at any point, to hasten the case to trial.

Further, "[t]rial courts have a number of tools available to fulfill their responsibility to advance a case to trial in a timely manner. Courts should make affirmative inquiries about the procedural posture of a case and the status of counsel's trial preparation; ask alleged [sexually violent predators] about their wishes for the timing of trial (or, if the alleged [sexually violent predators] is not present, ask counsel whether there is ongoing communication with the alleged [sexually violent predators] about their wishes regarding trial timing); set a date for trial within a reasonable time

from the probable cause hearing; and carefully examine the propriety of continuing that date once it has been set. As in the criminal context, it is ' "entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines." ' " (*Camacho, supra*, 15 Cal.5th at p. 389.) "Trial courts also bear the critical duty of creating an adequate record to enable review of any claims that trial has been unconstitutionally delayed." (*Ibid.*) "From the limited available record, it appears the trial court allowed long periods of time to elapse without setting a trial date at all; if the trial court made efforts to move the case along, they are not apparent." (*Ibid.*)

Nonetheless, while the prosecution and the trial court "certainly could have done more to urge the case to trial and enforce deadlines, the responsibility for the delay rests primarily with the defense. The second *Barker* factor thus weighs against finding a violation of his constitutional right to a timely trial." (*Camacho, supra*, 15 Cal.5th at p. 390.)

     *c. Factor Three: Defendant's Assertion of the Speedy Trial Right*

The third *Barker* factor requires us to examine the defendant's assertion of his speedy trial right. (*Camacho, supra*, 15 Cal.5th at p. 390.) This factor "does not hinge on ' "the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial." ' " (*Ibid.*) " '[F]ailure to assert the right [to a speedy trial] will make it difficult for a defendant to prove that he was denied a speedy trial.' " (*Id.* at pp. 390–391.)

57

Garland does not direct us to anything in the record suggesting he invoked his right to a speedy trial or even wanted to proceed to trial. Nor, based on own review of the record, have we been able to locate an assertion of Garland's speedy trial right. On the contrary, our review of the record shows the defense repeatedly sought continuances from the trial court.[20]

Moreover, beginning in July 2013, Garland personally signed, and his defense counsel filed on his behalf, six *Litmon* waivers—five of which asked the court to refrain from setting court hearings or the trial for 12-month periods at a time. With each *Litmon* waiver Garland executed, he expressly acknowledged he understood his right to a speedy trial, but waived his right for the stated purpose of pursuing mental health treatment.[21]

Because Garland did not invoke his right to a speedy trial, and instead waived his right in the *Litmon* waivers he signed and filed, the third *Barker* factor weighs heavily against a finding of a speedy trial violation.

### d. Factor Four: Prejudice

Under the fourth *Barker* factor, we consider the extent to which the pretrial delay prejudiced the defendant. (*Camacho, supra*, 15 Cal.5th at p. 391.) " 'Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.' " (*Ibid.*) Those interests include the prevention of oppressive pretrial incarceration, the minimization of anxiety and concern for the accused, and the limitation of any possibility the defense will be impaired. (*Ibid.*) The Supreme Court has

---

[20] We decline Garland's invitation to construe his offers to waive a jury trial as implied invocations of his right to a speedy trial.

[21] Although Garland did not subsequently participate in mental health treatment after he filed the *Litmon* waivers, these post-hoc developments do nothing to alter the fact that Garland repeatedly waived his speedy trial right in court filings and failed to exercise his right in a timely manner.

described the last interest—the limitation of any possible impairment to the defense—as the most serious interest, "since impairment to an individual's ability to present a defense 'skews the fairness of the entire system.' " (*Ibid.*)

To be sure, the delay in this case prejudiced Garland in the sense that it led to his continued commitment at the state hospital—a severe restraint on his liberty which, in turn, may have "give[n] rise to feelings of anxiety and concern." (*Camacho, supra*, 15 Cal.5th at p. 392.) The prejudice became somewhat more pronounced from 2015 onwards, after Dr. Korpi flipped his evaluation and Garland's odds of prevailing at trial improved. (See *id.* at p. 393 ["For individuals who have never received a favorable expert evaluation, delay in holding trial will generally entail less prejudice than for individuals who have a more substantial basis for arguing they do not satisfy the criteria for [sexually violent predator] commitment."].) However, this prejudice was "extenuated by the fact that [Garland] has not shown he in fact wanted a timely trial." (*Ibid.*; see *Barker, supra*, 407 U.S. at p. 534 ["More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial."].)

Further, Garland has not shown that the pretrial delay impaired his ability to mount a defense at trial. There is no indication the pretrial delay resulted in the erasure or destruction of helpful defense evidence. On the contrary, the delay seemingly helped the defense in one important sense, by ensuring Garland was over the age of 60 at trial—a development that both significantly reduced Garland's scores on the diagnostic tools used to measure his recidivism risk and factored heavily into Dr. Korpi's decision to flip his opinion and conclude Garland was no longer a sexually violent predator.

In his appellate briefs, Garland contends the delay impaired his ability to present a defense because Dr. Padilla passed away in 2013 and, if there

had been no delay, Garland potentially could have called Dr. Padilla as an expert witness to testify about "whether he met the [sexually violent predator] criteria." This speculation does not establish prejudice. There is no inkling in the record that Dr. Padilla evaluated Garland or that the defense considered him as a proposed witness prior to his death. Further, it is sheer conjecture to assume Dr. Padilla would have given the defense a favorable evaluation if, in a counterfactual world, he had evaluated Garland.

For all these reasons, Garland has not established that his defense was impaired or that he was otherwise significantly prejudiced by the delay.

### e. Conclusion

On balance, the *Barker* factors weigh against a finding of a speedy trial violation. The 20-year pretrial delay in this case was, of course, exceptionally lengthy. And the trial court and prosecution surely could have—and should have—done more to bring the case across the finish line of trial. Nonetheless, "the defense, rather than the state, bears more responsibility for the delay." (*Camacho, supra*, 15 Cal.5th at p. 394.) Garland and his defense team requested countless continuances, repeatedly waived his right to a speedy trial, and suffered no significant prejudice from the delay. On these facts, we conclude there was no violation of Garland's right to a speedy trial.

## IV

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

IRION, J.